1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   FRANK B. HALYDAY,

11          Plaintiff,                      No. 2:12-cv-01761 KJN

12      v.

13   CAROLYN W. COLVIN,
     Commissioner of Social Security,
14
            Defendant.                      <u>ORDER</u>
15   _____/

16          Plaintiff, who is represented by counsel, seeks judicial review of a final decision

17   of the Commissioner of Social Security ("Commissioner" or "defendant") denying plaintiff's

18   application for Supplemental Security Income benefits under Title XVI of the Social Security Act

19   ("Act").[1]  In his motion for summary judgment, plaintiff contends that the administrative law

20   judge ("ALJ") in this case erred by: (1) "failing to analyze Dr. Tobias' opinion and in failing to

21   articulate specific and legitimate reasons for not crediting Dr. Scaramozzino's opinion;" (2)

22   failing to "adequately explain his basis for not finding that [plaintiff's] condition met the

23   requirements of Listing 12.05C;" (3) and failing to properly analyze the "extent of" plaintiff's

24

25          [1] This case was referred to the undersigned pursuant to Eastern District of California Local
     Rule 302(c)(15) and 28 U.S.C. § 636(c), and both parties voluntarily consented (ECF Nos. 7, 8) to
     proceed before a United States Magistrate Judge.  28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73; E.D.
26   Cal. L. R. 301.

"visual limitations" in light of plaintiff's "inability to afford cataract surgery," failing to "seek

clarification from Dr. Contreras as to [plaintiff's] vision without surgery," and failing to explain

"why he was not crediting Dr. Jackson's opinion as to [plaintiff's] visual limitations." (Mot. for

Summ. J., ECF No. 13-1 at 1-2.)

Defendant filed a cross-motion for summary judgment and opposition to

plaintiff's motion. (Opp'n, ECF No. 16.) Plaintiff filed reply briefing in support of his motion.

(Reply, ECF No. 17.) For the reasons stated below, the court grants plaintiff's motion for

summary judgment, denies the Commissioner's cross-motion for summary judgment, and

remands this case for further proceedings.

I.      BACKGROUND

A.      Procedural History[2]

Plaintiff filed an application for supplemental security income on June 27, 2008,

alleging a disability onset date of December 1, 1981.[3] (Administrative Transcript ("AT") 17, 23.)

---

[2] Because the parties are familiar with the factual background of this case, including plaintiff's medical history, the undersigned does not exhaustively relate those facts here. The facts related to plaintiff's impairments and medical history will be addressed insofar as they are relevant to the issues presented by the parties' respective motions.

Additionally, to the extent the undersigned uses the present tense in referring to or describing plaintiff's alleged conditions or functional abilities, or the ALJ's or Appeals Council's characterizations of the same, the undersigned clarifies that such references are to plaintiff's conditions or functional abilities at the time of the ALJ's or Appeals Council's decision, unless otherwise indicated.

[3] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 et seq. Generally speaking, Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. §§ 1382 et seq. Under both benefit schemes, the term "disability" is defined, in part, as an "inability to engage in any substantial gainful activity" due to "any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits. See 20 C.F.R. §§ 404.1520, 404.1571-1576, 416.920, 416.971-976; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Ninth Circuit Court of Appeals has summarized the sequential evaluation as follows:

Step one:  Is the claimant engaging in substantial gainful

1   The Social Security Administration denied plaintiff's application on December 18, 2008, and

2   again upon reconsideration.  (AT 60-70.)  Plaintiff filed a request for a hearing before an ALJ

3   (AT 73), and the ALJ conducted a hearing on May 3, 2010.  (AT 17.)  Plaintiff, who was

4   represented by an attorney, testified at the hearing.  (AT 31-54.)  A vocational expert ("VE") also

5   testified at the hearing.  (Id.)

6           In a decision dated May 28, 2010, the ALJ denied plaintiff's application for

7   benefits based on a finding that plaintiff is capable of performing work that exists in significant

8   numbers in the national economy, including work as a hand packer, cleaner, and laborer.  (AT

9   24.)  The ALJ's decision became the final decision of the Commissioner when the Appeals

10  Council denied plaintiff's request for review.  (AT 1-5.)  Plaintiff subsequently filed this action.

11          B.      Summary of the ALJ's Findings

12          The ALJ conducted the required five-step evaluation and concluded that plaintiff

13  is not disabled within the meaning of the Act.  At step one, the ALJ concluded that plaintiff had

14

15          activity?  If so, the claimant is found not disabled.  If not, proceed to
            step two.

16          Step two:  Does the claimant have a "severe" impairment?  If
17          so, proceed to step three.  If not, then a finding of not disabled is
            appropriate.

18          Step three:  Does the claimant's impairment or combination
19          of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
            404, Subpt. P, App.1?  If so, the claimant is automatically determined
20          disabled.  If not, proceed to step four.

            Step four:  Is the claimant capable of performing his past
21          work?  If so, the claimant is not disabled.  If not, proceed to step five.

22          Step five:  Does the claimant have the residual functional
            capacity to perform any other work?  If so, the claimant is not
23          disabled.  If not, the claimant is disabled.

24  Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

25          The claimant bears the burden of proof in the first four steps of the sequential evaluation
    process.  Bowen, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential
26  evaluation process proceeds to step five.  Id.

3

1    not engaged in substantial gainful activity since his application date of June 27, 2008.  (AT 19.)

2    At step two, the ALJ concluded that plaintiff had the following "severe" impairments: "bilateral

3    vision loss (left worse than right), obesity, organic mental disorder, and mental retardation."  (Id.)

4            At step three, the ALJ determined that plaintiff's impairments, whether alone or in

5    combination, did not meet or medically equal any impairment listed in the applicable regulations,

6    20 C.F.R. Pt. 404, Subpt. P, App. 1.  (AT 19-20.)  In particular, the ALJ found that plaintiff's

7    impairments did not meet Listing 12.05C because "the claimant does not have a valid verbal,

8    performance, or full scale IQ of 60 through 70 and a physical or other mental impairment

9    imposing an additional and significant work-related limitation of function."  (AT 20.)

10           The ALJ further determined that plaintiff has the Residual Functional Capacity

11   ("RFC") to perform "a full range of work at all exertional levels but with the following

12   nonexertional limitations: cannot be exposed to hazards; cannot engage in any job duties

13   requiring fine visual acuity; and is limited to simple, routine tasks."  (AT 20.)  In making this

14   RFC determination, the ALJ found that plaintiff's statements regarding "the intensity, persistence

15   and limiting effects of" his symptoms were "not credible to the extent they are inconsistent with

16   the above residual functional capacity assessment."  (AT 21.)

17           The ALJ gave "significant" or "great" weight to several medical opinions of

18   record.  He gave "significant weight" to the opinion of Dr. Jackson (AT 247-51), a non-

19   examining physician who opined that plaintiff had "no exertional limitations but must avoid

20   concentrated exposure to hazards and could not do jobs requiring binocular vision or fine,

21   detailed work."  (AT 22.)  The ALJ also gave "great weight" to the opinion of Dr. Lucila (AT

22   233-38), a non-examining physician who opined that plaintiff "can perform simple work."  (AT

23   23.)

24           The ALJ gave " little" weight to several other medical opinions of record.  He

25   gave "little weight" to the opinion of Dr. Hernandez (AT 218-21), an examining physician who

26   opined that plaintiff could perform "medium exertion with decreased visual acuity of the left

4

eye." (AT 22.)  The ALJ also gave "little weight" to the opinion of Dr. Scaramozzino (AT 212-17), an examining physician who diagnosed plaintiff with borderline intellectual functioning and attention deficit hyperactivity disorder (ADHD), and who opined that plaintiff had "moderate limitations in several areas" of functioning.  (AT 22.)

At step four, the ALJ considered the VE's testimony and concluded that plaintiff was unable to perform his past work because he does not have past relevant work.  (AT 23.)  The ALJ concluded, however, that plaintiff could perform other work, and that plaintiff was "not disabled" based on his ability to perform jobs that exist in significant numbers in the national economy.  (AT 23-24.)

II.      STANDARDS OF REVIEW

The court reviews the Commissioner's decision to determine whether it is: (1) free of legal error and (2) supported by substantial evidence in the record as a whole.  Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009); accord Vernoff v. Astrue, 568 F.3d 1102, 1105 (9th Cir. 2009).  This standard of review has been described as "highly deferential."  Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)); accord Valentine, 574 F.3d at 690.  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  Andrews, 53 F.3d at 1039; see also Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) ("[T]he ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence.").  Findings of fact that are supported by substantial evidence are conclusive.  42 U.S.C. § 405(g); see also McCarthy v. Apfel, 221 F.3d 1119, 1125 (9th Cir. 2000).  "Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's."  Bray, 554 F.3d at 1222; see also Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198

1   (9th Cir. 2008) ("'Where evidence is susceptible to more than one rational interpretation,' the

2   ALJ's decision should be upheld.") (quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir.

3   2005)).

4          However, the court "must consider the entire record as a whole and may not

5   affirm simply by isolating a 'specific quantum of supporting evidence.'" Ryan, 528 F.3d at 1198

6   (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)); accord Lingenfelter v.

7   Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  "To determine whether substantial evidence

8   supports the ALJ's decision, [a court] review[s] the administrative record as a whole, weighing

9   both the evidence that supports and that which detracts from the ALJ's conclusion." Andrews,

10  53 F.3d at 1039.

11         "If additional proceedings can remedy defects in the original administrative

12  proceeding, a social security case should be remanded." Marcia v. Sullivan, 900 F.2d 172, 176

13  (9th Cir. 1990) (quoting Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981)).  "Where the

14  Secretary is in a better position than this court to evaluate the evidence, remand is appropriate."

15  Id. (citing McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989)).  However, when

16  appropriate, the court may also in its discretion order an immediate payment of benefits.  Harman

17  v. Apfel, 211 F.3d 1172, 1177–78 (9th Cir. 2000).

18  III.    DISCUSSION

19         A.     Dr. Tobias' Opinion And Listing 12.05C

20         Plaintiff argues that the ALJ erred in failing to address the opinion of examining

21  physician Dr. Tobias and the IQ test results stated within that opinion, and that the ALJ therefore

22  erred in analyzing the applicability of Listing 12.05C.[4]  (Mot. for Summ. J. at 6-12.)  The

23

24         [4]  Given the relatedness of plaintiff's first two arguments, namely, that the ALJ erred by (1)
     "failing to analyze Dr. Tobias' opinion and in failing to articulate specific and legitimate reasons for
25   not crediting Dr. Scaramozzino's opinion;" and also erred by (2) failing "to adequately explain his
     basis for not finding that [plaintiff's] condition met the requirements of Listing 12.05C" (Mot. for
26   Summ. J. at 1-2), these arguments are combined for analysis herein.

argument is well-taken.

Although the ALJ's opinion makes no mention of it, the record contains a "Psychological Disability Evaluation" dated October 3, 2006, and signed by Dr. Faith Tobias, Ph.D., and Jacklyn Chandler, Psychological Assistant.  (AT 194-98.)  The Psychological Disability Evaluation followed an examination of plaintiff that included the administration of IQ tests.  (Id.)  According to the Psychological Disability Evaluation, plaintiff's "Full Scale" IQ score was 69, and Dr. Tobias considered the test results a "valid estimate of the claimant's current level of functioning."  (AT 196.)  The Psychological Disability Evaluation also reflected limitations on plaintiff's work-related abilities, such as "marked" limitations on ability to communicate effectively with others (written), and "moderate" limitations on ability to interact appropriately with co-workers, supervisors, and the public on a regular basis.  (AT 197-98.)  Yet the ALJ's decision makes absolutely no mention of Dr. Tobias' medical opinion, the IQ scores stated within that opinion, or the functional limitations described in that opinion.

At minimum, Dr. Tobias' opinion amounts to evidence that plaintiff has a valid full-scale IQ score of 69.  (AT 196.)  As described below, the existence of a valid IQ score below 70 is relevant to whether plaintiff's condition satisfies the requirements of Listing 12.05C.

1.    *Listing 12.05C*

At Step Three, the ALJ asks whether the claimant's impairment or combination of impairments meets or equals an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1 ("the Listings"), and if the answer is yes, the claimant is automatically determined to be disabled. Lester, 81 F.3d at 828 n.5.

Listing 12.05C, mental retardation, "refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.  The Listing can be met by satisfying the requirements of paragraph C: "A valid verbal, performance, or full scale IQ of 60 through 70 and

1  a physical or other mental impairment imposing an additional and significant work-related

2  limitation of function."[5]  Id.  The Listing continues: "For paragraph C, we will assess the degree

3  of functional limitation the additional impairment(s) imposes to determine if it significantly

4  limits your physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s),

5  as defined in §§ 404.1520(c) and 416.920(c).  If the additional impairment(s) does not cause

6  limitations that are 'severe' as defined in §§ 404.1520(c) and 416.920(c), we will not find that

7  the additional impairment(s) imposes 'an additional and significant work-related limitation of

8  function,' even if you are unable to do your past work because of the unique features of that

9  work."  Id.

10         Thus, a plaintiff meets Listing 12.05C's requirements if he: (1) has an IQ score

11  between 60 and 70 and the evidence demonstrates or supports onset of the impairment before age

12  22; and (2) he has a physical or other mental impairment imposing an additional and significant

13  work-related limitation of function (i.e., a "severe" impairment).  As described below, evidence

14  in the record indicates that plaintiff has an IQ score between 60 and 70, evidence in the record

15  potentially supports onset before age 22, and plaintiff has other "severe" impairments that

16  impose significant work-related limitations.

17  _____

18         [5]  The text of Listing 12.05C provides:

19         12.05 Mental retardation: Mental retardation refers to
               significantly subaverage general intellectual functioning
20             with deficits in adaptive functioning initially manifested
               during the developmental period; i.e., the evidence
21             demonstrates or supports onset of the impairment before
               age 22.
22
               [. . .]
23
               C. A valid verbal, performance, or full scale IQ of 60
24             through 70 and a physical or other mental impairment
               imposing an additional and significant work-related
25             limitation of function[.]

26  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05C.

8

1         2.     *The ALJ Failed To Acknowledge Or Evaluate Dr. Tobias' Opinion That*
2                *Plaintiff Had A "Valid" IQ Score of 69*

3              The ALJ analyzed Listing 12.05C as follows: "[T]he 'paragraph C' criteria of

4    [L]isting 12.05 are not met because the claimant does not have a valid verbal, performance, or

5    full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional

6    and significant work-related limitation of function."  (AT 20.)

7              Crucially, the ALJ never acknowledged that the record contains evidence of

8    plaintiff's full scale IQ score of 69 (AT 196), and the ALJ neither analyzed the validity of that

9    score nor gave any reasons for rejecting the score's validity.  The Ninth Circuit Court of Appeals

10   has not delineated what evidence an ALJ should consider in assessing whether IQ scores are

11   "valid"; however, it has found error where an ALJ failed to address the validity of an IQ score in

12   applying Listing 12.05.[6]  See Thresher v. Astrue, 283 Fed. App'x 473, 475 (9th Cir. 2008)

13   (unpublished) (remanding for further proceedings after finding that the ALJ erred in analyzing

14   Listing 12.05C because "while the ALJ pointed to the level of [plaintiff's] functioning, she did

15   not find that the [IQ] score was invalid, and the listing does not speak to functioning — it speaks

16   only to the IQ score itself."); Gomez v. Astrue, 695 F. Supp. 2d 1049, 1057-58 (C.D. Cal. 2010)

17   (finding error and awarding benefits where the ALJ "silent[ly] disregard[ed]" plaintiff's IQ score,

18   because "the ALJ cannot disregard a valid IQ simply because other evidence in the record could

19   support a finding of nondisability in the absence of such a score.") (citing Thresher, 283 Fed.

20   App'x at 475 & n.5).[7]

21

22           [6] District courts within the Ninth Circuit have addressed what evidence an ALJ may consider
     in assessing the validity of IQ scores.  E.g., Wedge v. Astrue, 624 F. Supp. 2d 1127, 1131-35 (C.D.
23   Cal. 2008) (summarizing considerations from out-of-circuit cases, such as whether the evidence
     shows a high possibility of malingering, daily activities inconsistent with the IQ scores,
24   inconsistencies between test results, and conflicting medical opinions); Vasquez v. Astrue, No.
     EDCV 11–883–OP, 2012 WL 590019, at *6-7 (C.D. Cal. Feb. 21, 2012) (unpublished) (same).
25
           [7] Although Thresher is an unpublished decision and thus only of persuasive value, it is cited
26   herein pursuant to Ninth Circuit Rule 36-3, which provides that "[u]npublished dispositions and

                                            9

1         In any event, while an ALJ can consider various types of evidence to determine

2   whether IQ scores are "valid," in this particular case, the ALJ did not explicitly consider *any*

3   evidence before concluding that plaintiff lacks a "valid" IQ score.  (AT 20.)  Indeed, the ALJ

4   never mentioned the evidence of plaintiff's IQ scores, let alone discussed whether or why those

5   scores might be invalid.  Instead, the ALJ conclusorily found only that plaintiff "does not have a

6   valid verbal, performance, or full scale IQ score," offering no explanation for that finding and

7   making no reference to the only IQ scores in the record — those in Dr. Tobias' opinion.  (AT

8   20.)  The ALJ is "always" obligated to "consider" and "evaluate every medical opinion" the

9   Commissioner receives in the record, see 20 C.F.R. § 416.927(b)-(c), and in this case, the

10  medical record includes Dr. Tobias' report from October 3, 2006.  (AT 196.)  Accordingly, the

11  ALJ erred in analyzing Listing 12.05C and in finding that plaintiff did not satisfy the Listing due

12  to a lack of valid IQ scores.

13           3.   *The ALJ's Error Was Not Harmless*

14        Defendant contends that this error was harmless for various reasons, but the

15  arguments are not well-taken.  While an ALJ's failure to acknowledge or analyze an IQ score in

16  the "60 through 70" range might potentially be harmless if there was no evidence in the record to

17  support the remaining elements of Listing 12.05C, the record in this case contains evidence that

18  could potentially satisfy those remaining elements.  For example, there is at least some evidence

19  in the record supporting a potential onset of plaintiff's mental impairment before age 22.  (AT

20  183-88 (school records identifying plaintiff as a "learning disabled student" with a 1.3 grade

21  reading level in tenth grade).)[8]  There is also evidence of plaintiff's physical or other mental

22  ───────────────

23  orders of this Court issued on or after January 1, 2007 may be cited to the courts of this circuit in
    accordance with FRAP 32.1."

24

25     [8]  School records can be relevant to a determination of the validity of IQ scores and onset of
    the mental impairment before age 22.  E.g., Wedge, 624 F. Supp. 2d at 1134 (in analyzing the
    validity of plaintiff's IQ scores under Listing 12.05C, the court discussed evidence of record

26  indicating that plaintiff "never had substantial gainful employment, has not been able to graduate

impairment imposing an additional and significant work-related limitation of function (i.e., a "severe" impairment).[9]  (AT 19 (finding that plaintiff has several "severe" impairments).) Accordingly, it cannot be said that the ALJ's failure to acknowledge plaintiff's IQ scores and failure to assess their validity amounts to harmless error.  In other words, if the ALJ had considered the IQ scores and accepted Dr. Tobias' opinion that they were "valid," it is possible that the evidence would have satisfied all elements of Listing 12.05C.

Defendant argues that the ALJ's error was harmless given that plaintiff was diagnosed with "borderline intellectual functioning, rather than mental retardation."[10]  (Opp'n at 9-10.)  Defendant emphasizes that neither Dr. Scaramozzino nor Dr. Lucila actually "diagnosed Plaintiff with mental retardation."  (Id. at 10.)   First, contrary to defendants' position, "the absence of a diagnosis of 'mental retardation' does not preclude plaintiff from meeting section 12.05C or invalidate his IQ" score.[11]  Gomez, 695 F. Supp. 2d at 1057-58.  Second, while the

---

high school, has attended special education classes, and has done poor to average in the classes she attended," and concluded that such evidence was "consistent with [plaintiff's] low to borderline intellectual functioning.")

[9]  Where the ALJ finds that plaintiff has a "severe" impairment at Step Two, this equates to a finding that the plaintiff meets the second prong of Listing 12.05C.  See, e.g., Rowens v. Astrue, No. CIV S–09–0163 GGH, 2010 WL 3036478, at *2-4 (E.D. Cal. Aug. 2, 2010) (unpublished) ("[I]n this circuit, a person who has a severe physical or other mental impairment, as defined at step two of the disability analysis, apart from the decreased intellectual function, meets the second prong of the § 12.05(c) listing.");  Woods v. Astrue, No. CIV S–10–2031 GEB EFB P, 2012 WL 761720, at *4 (E.D. Cal. March 7, 2012) (unpublished) (finding that the plaintiff met Listing 12.05C's second prong given the ALJ's finding that plaintiff had "severe" impairments at Step Two).

[10]  To explain the conflict between the ALJ's Step Two determination that plaintiff suffers from "mental retardation" and the determination that plaintiff does not satisfy the requirements of Listing 12.05C, defendant argues that the ALJ's decision shows that the ALJ implicitly "did not believe that the evidence supported a finding that Plaintiff's mental impairment was so limiting so as to make him incapable of even simple, repetitive tasks."  (Opp'n at 10.)

[11]  A diagnosis of mental retardation is not required in order for a claimant to meet the Listing's requirements.  See Christner v. Astrue, 498 F.3d 790, 793 (8th Cir. 2007) ("[W]e have specifically held that a formal diagnosis of mental retardation is not required to fall within the confines of section 12.05.  Thus, it is clear that claimants need only meet the listing requirements stated in section 12.05.  The ALJ erred in giving any credence to the lack of a diagnosed mental deficiency in [plaintiff's] case.") (internal citations omitted); Frazier v. Astrue, No. CV–09–3063–CI,

ALJ's conclusions about plaintiff's "mental retardation" diagnosis and his functional abilities to

perform "simple, repetitive tasks" might have some degree of evidentiary support, however, this

does not render harmless the ALJ's failure to acknowledge the evidence of plaintiff's IQ scores

and failure to explain whether he considered those scores to be valid.  See Thresher, 283 Fed.

App'x at 475; Gomez, 695 F. Supp. 2d at 1057 (finding error and awarding benefits where the

ALJ "silent[ly] disregard[ed]" plaintiff's IQ score, because "the ALJ cannot disregard a valid IQ

simply because other evidence in the record could support a finding of nondisability in the

absence of such a score.") (citing Thresher, 283 Fed. App'x at 475 & n.5).  Here, because a

"valid" IQ score of 69 would satisfy the first prong of Listing 12.05C, it was error for the ALJ

not to address the evidence of that score.  That the ALJ may have made supported findings about

plaintiff's *functional limitations* does not render harmless his error in applying the "valid IQ"

prong of Listing 12.05C.

        Defendant argues that "substantial evidence support[s] the ALJ's decision despite

the fact that Dr. Tobias' opinion was not discussed."  (Opp'n at 8.)  With respect to plaintiff's IQ

scores and the application of Listing 12.05C, however, this is not the case.  As noted above, the

*only* evidence in the record regarding plaintiff's IQ scores indicates that the scores were "valid."

(AT 196.)  Thus, it cannot be said that "substantial evidence" supports the ALJ's finding that

plaintiff "does not have a valid verbal, performance, or full scale IQ" score in the record.  (AT

20.)

        Defendant also argues that because the ALJ considered Dr. Lucila's opinion and

Dr. Scaramozzino's opinion, and because *those physicians* considered Dr. Tobias' opinion, the

---

2010 WL 3910331, at *4 (E.D. Wash. Oct. 4, 2010) (unpublished) (holding that "[t]here is no
requirement for a formal diagnosis of 'mental retardation'" for a plaintiff to meet Listing 12.05C);
Cauffman v. Astrue, No. C10–281–JCC –JPD, 2010 WL 5464815, at *10 (W.D. Wash. Nov. 12,
2010) (unpublished) (holding that a "lack of a diagnosis of mental retardation . . . has no bearing on
whether plaintiff's impairments meet listing 12.05(C).");  Lewis v. Astrue, No. C 06-6608 SI, 2008
WL 191415, at *5–7 (N.D. Cal. Jan. 22, 2008) (unpublished) (finding that "the ALJ erred by holding
that claimant had to make a showing of mental retardation beyond that which is required by Listing
12.05" by also requiring evidence of a diagnosis of mental retardation).

1  ALJ essentially considered Dr. Tobias' opinion and the IQ scores therein.  (Opp'n at 8-9.)  On

2  the facts of this particular case, the argument is unpersuasive.  Even though Drs. Lucila and

3  Scaramozzino referenced Dr. Tobias' opinion within their own opinions, neither physician

4  specifically opined that the IQ scores within Dr. Tobias' opinion were invalid.  (AT 212 (Dr.

5  Scaramozzino notes only that he reviewed records dated "October 3, 2006," the date of Dr.

6  Tobias' opinion); 236-37 (Dr. Lucila notes that plaintiff previously obtained scores of "WAIS

7  69-75" and that "scores are considered still valid").)  There is no medical opinion evidence in the

8  record addressing the validity of the IQ scores *other than* Dr. Tobias' opinion.  Thus, even if the

9  ALJ somehow considered Dr. Tobias' opinion by proxy when he considered the opinions of Drs.

10  Lucila and Scaramozzino, which the undersigned does not find, the ALJ nevertheless failed to

11  explain why he deemed the only IQ scores in the record invalid even though Drs. Scaramozzino

12  and Lucila did not do so.

13          Plaintiff also makes the related argument that the ALJ failed to give specific and

14  legitimate reasons for not crediting Dr. Scaramozzino's opinion, especially given that Dr.

15  Scaramozzino's opinion was partially based upon Dr. Tobias' opinion.  (Mot. for Summ. J. at 6,

16  9-10; Reply at 2).  In particular, plaintiff argues that "[s]ince the ALJ failed to realize that Dr.

17  Scaramozzino's opinion was partially based up on Dr. Tobias' report which is based on detailed

18  intellectual functioning testing, the ALJ failed to articulate specific and legitimate reasons for not

19  crediting Dr. Scaramozzino's opinion" on grounds that the physician's examination findings did

20  not support his conclusions.  (Mot. for Summ. J. at 9-10.)  Plaintiff's argument is well-taken.  As

21  described above, in analyzing Listing 12.05C, the ALJ appeared to ignore both Dr. Tobias'

22  opinion and the various test results (including IQ test results) stated in that opinion.  (AT 20.)

23  The ALJ also discounted Dr. Scaramozzino's opinion in part because the ALJ believed it to be

24  unsupported by examination findings (AT 22-23), but Dr. Tobias' examination and resulting

25  opinion (upon which Dr. Scaramozzino relied (AT 212)) could potentially suffice as such

26  supporting evidence.

1    While defendant is correct that "[a]n IQ score is not dispositive" (Opp'n at 9),

2   here, plaintiff's IQ scores are squarely relevant to the application of Listing 12.05C and the ALJ

3   erred in not addressing them.  Indeed, the existence of a valid IQ score will itself satisfy the first

4   prong of Listing 12.05C, as described above.  Moreover, plaintiff does not argue that his IQ

5   scores are "dispositive"; instead, plaintiff argues that his IQ scores should have been part of the

6   ALJ's Listing 12.05C analysis, and should not have been ignored or silently rejected without any

7   meaningful discussion as to why.

8    Defendant also argues that the ALJ's error was harmless given that Dr. Tobias

9   rendered her opinion on October 3, 2006, "a little less than two years before Plaintiff filed his

10  SSI application, and prior to the relevant period," such that the ALJ properly gave more weight to

11  the other medical opinions that were rendered more recently.  (Opp'n at 7-8.)  The gist of this

12  argument appears to be that the evidence supports the ALJ's decision to credit medical opinions

13  other than Dr. Tobias'.  The validity of more recent medical opinions, however, does not render

14  harmless the ALJ's error in analyzing Listing 12.05C without considering Dr. Tobias' opinion

15  and thus ignoring record evidence of plaintiff's IQ scores.  None of the other medical opinions

16  included their own IQ tests or offered any assessment of the validity of the IQ scores stated

17  within Dr. Tobias' opinion.  Indeed, the only evidence in the record pertaining to the IQ scores

18  suggests that the scores are "valid." (AT 196.)  Accordingly, even if the ALJ had good reasons

19  for giving weight to medical opinions other than Dr. Tobias', this does not render harmless the

20  ALJ's failure to acknowledge and address plaintiff's IQ scores as part of his analysis of Listing

21  12.05C.

22    Defendant also offers no authorities regarding the weight to be given to medical

23  evidence outside the "relevant period."  At most, defendant cites authorities for the proposition

24  that plaintiff "is statutorily ineligible for any SSI benefits prior to the protective filing date of the

25  application at issue," which is June 27, 2008, making the "relevant period" *for benefits payments*

26  from that date to the ALJ's decision date.  (Opp'n at 1 n.2 (citing 20 C.F.R. §§ 416.330(a);

416.335).)  However, defendant has not shown that plaintiff's *ineligibility for benefits payments*

prior to a certain period necessarily dictates the court's (or the ALJ's) ability to examine medical

evidence *in the record* but predating that period.  Defendant has not offered authorities

suggesting that, based on date alone, more recent medical opinions should necessarily be deemed

weightier than older opinions in the record.  Moreover, as plaintiff notes, IQ scores are

sometimes held to remain constant over time absent intervening circumstances.[12]  (Reply at 2

(citing out-of-circuit cases).)  Thus, even "older" IQ scores are relevant to whether Listing

12.05C applies, especially here, when the older IQ scores are the *only* scores in the record.

Defendant has not shown that the ALJ's failure to acknowledge Dr. Tobias' opinion (or the IQ

scores therein) was harmless simply by virtue of the date that opinion was rendered, or by virtue

of the fact that the ALJ relied on more recent medical opinions that did not evaluate plaintiff's

IQ.

　　　　　Defendant also argues that plaintiff's IQ scores "were on the higher end" of the

range stated within Listing 12.05C, such that the ALJ's failure to address plaintiff's IQ scores

was harmless.  (Opp'n at 9.)  However, while plaintiff's "verbal" and "performance" IQ scores

fall outside the "60 through 70" range stated within Listing 12.05C, the regulations also specify

that when verbal, performance, and full scale scores are provided by an IQ test, the ALJ must

consider the *lowest* of these scores.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c) ("In

---

[12] See also Flores v. Astrue, No. CV 11–10714–MAN, 2013 WL 146190, at *4-5 (C.D. Cal. Jan. 11, 2013) (unpublished) (collecting cases); Woods, 2012 WL 761720, at *3-4 (finding that "[a]bsent some evidence of a change in cognitive ability or some other persuasive information to account for a change in condition relating to the plaintiff's ability prior to age 22 and the date of the IQ testing, there appears to be no factual basis for concluding that the IQ inexplicably dropped after age 22."); Forsythe v. Astrue, No. 1:10–cv–01515 AWI GSA, 2012 WL 217751, at *7-9 (E.D. Cal. Jan. 24, 2012) (unpublished) (collecting cases); Schuler v. Astrue, No. CV 09–2126–PLA, 2010 WL 1443892, at *6 (C.D. Cal. Apr. 7, 2010) (unpublished) ("a valid qualifying IQ score obtained by the claimant after the age of 22 creates a rebuttable presumption that the claimant's mental retardation began prior to the age of 22, as it is presumed that IQ scores remain relatively constant during a person's lifetime."); Jackson v. Astrue, No. CV 08–1623 JC, 2008 WL 5210668, at *6-7 (C.D. Cal. Dec. 11, 2008) (unpublished) ("several circuits have held that valid IQ tests create a rebuttable presumption of a fairly constant IQ throughout a claimant's life . . . The Court finds the reasoning of the Seventh, Eighth, and Eleventh Circuits to be persuasive.")

cases where more than one IQ is customarily derived from the test administered, e.g., where

verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of

these in conjunction with 12.05.")  Plaintiff's "Full Scale" score was 69 and thus falls within the

range stated in Listing 12.05C.  (AT 196.)  Accordingly, the argument that the ALJ did not err in

ignoring plaintiff's IQ scores because they were "were on the higher end" (Opp'n at 9) is not

well-taken.

### 4.   *Remand*

For all the foregoing reasons, the ALJ erred in failing to address the evidence of

plaintiff's full scale IQ score of 69 and Dr. Tobias' opinion that the score was "valid." (AT 196.)

Defendant has not shown that the error was harmless.  Accordingly, plaintiff's motion is granted

in part, and the matter is remanded to the Commissioner for clarification regarding the nature of

the ALJ's considerations at Step 3 and precisely what was decided and why with respect to

plaintiff's IQ scores (AT 196).  See Thresher, 283 Fed. Appx. at 475.  On remand, the ALJ

should specify whether he finds plaintiff's IQ scores to be either invalid or valid, and shall

explain why.  See id. at 475 n.6.  The Commissioner shall also clarify his assessment of Dr.

Scaramozzino's opinion insofar as that opinion was partially premised upon a review of Dr.

Tobias' examination and opinion.  (AT 212.)

Plaintiff requests that the case be remanded for immediate payment of benefits.

(Mot. for Summ. J. at 15.)  However, an award of benefits is only appropriate where "no useful

purpose would be served by further administrative proceedings," where "the record has been

thoroughly developed," and where "there are no outstanding issues that must be resolved before a

proper disability determination can be made."  Varney v. Sec'y of Health & Human Servs., 859

F.2d 1396, 1399, 1401 (9th Cir. 1988).  Here, the "outstanding issue" of the validity of the IQ

scores described within Dr. Tobias' opinion must be resolved.  See id.  The ALJ's opinion made

no mention of those scores or that opinion, and the undersigned finds that the better course of

action is to remand the case for further proceedings as outlined above.  The undersigned

1    expresses no opinion regarding the weight ultimately to be given to any particular evidence on

2    remand, and leaves it to the sound discretion of the ALJ to evaluate the record as a whole within

3    the confines of the applicable law.

4               B.      Plaintiff's Visual Limitations

5               1.      *Dr. Contreras' Opinion*

6               Plaintiff also argues that the ALJ erred in failing to resolve an internal

7    inconsistency in the medical opinion evidence regarding plaintiff's visual abilities.  (Mot. for

8    Summ. J. at 13-15.)  In particular, plaintiff argues that consultative examining ophthalmologist

9    Dr. Contreras opined that plaintiff's left eye vision "could be rehabilitated to 20/50 level" with

10   cataract surgery (AT 240), but also somewhat confusingly appeared to opine that plaintiff

11   presently has "20/50" vision (AT 239).  (Mot. for Summ. J. at 13.)  Plaintiff thus argues that Dr.

12   Contreras' opinion is "internally inconsistent as far as Mr. Halyday's *present condition, without*

13   *surgery*."  (Id. (emphasis added).)  Specifically, Dr. Contreras opined,

14                      I feel that **if** the patient was to obtain cataract extraction
                       with intraocular lens implantation, the vision in his left
15                      eye could be rehabilitated to 20/50 level, which would
                       allow him to be functional in the work setting and avoid
16                      hazards as well as handle small objects.

17   (AT 240 (emphasis added).)  In reliance on Dr. Contreras' opinion, the ALJ concluded that

18   plaintiff's "corrected vision [was] 20/50" and crafted plaintiff's RFC so as to limit plaintiff's

19   work activities to those not requiring "fine visual acuity" or exposure to "hazards."  (AT 20, 22

20   (citing AT 239-40).)

21               As plaintiff compellingly argues, the ALJ never addressed the fact that Dr.

22   Contreras' assessment of plaintiff's functional limitations *was contingent on plaintiff's first*

23   *undergoing cataract surgery*.  (Mot. for Summ. J. at 13-15.)  Plaintiff argues that, because Dr.

24   Contreras conditioned his functional assessment upon plaintiff's surgery, the fact that plaintiff

25   *has not had such surgery* means that Dr. Contreras' opinion should be read as evidence that

26   plaintiff is not presently "functional in the work setting," is not presently able to perform work so

17

1  long as it "avoid[s] hazards," and is not presently able to perform work requiring the handing of

2  "small objects."  (AT 240.)

3         Defendant's only counter argument is that Dr. Contreras actually opined that

4  plaintiff could *presently* "avoid hazards" and "handle small objects" without surgery and with his

5  current vision.  (Opp'n at 10 ("Consistent with Dr. Contreras's statement of Plaintiff's current

6  visual abilities, the ALJ found Plaintiff should avoid hazards and could not perform job duties

7  requiring fine visual acuity, which suggests that he would be unable to handle small objects.").)

8  Defendant's argument is not well-taken.  On the undersigned's reading of the evidence, Dr.

9  Contreras opined that plaintiff could perform such tasks only "if" he underwent surgery.  (AT

10  240.)

11         In any case, the debate about what Dr. Contreras actually opined indicates that

12  there is a material ambiguity in the record with respect to plaintiff's visual abilities and

13  functional limitations resulting therefrom.  The ALJ failed to resolve that ambiguity, and the

14  ALJ's opinion is unclear regarding plaintiff's *present* visual abilities, without surgery.  Perhaps

15  the ALJ determined that plaintiff's visual limitations, *without surgery*, presently permit plaintiff

16  to work as long as the work does not require "fine visual acuity" or exposure to "hazards."

17  Perhaps the ALJ determined that plaintiff could perform such work only *after surgery,* as Dr.

18  Contreras hypothesized (AT 240).  From the ALJ's opinion, however, it is unclear whether the

19  ALJ believed plaintiff first needs eye surgery before he can perform the sorts of work described

20  in the vision-related medical opinions of record.  (AT 239-46; 247-51.)  The ALJ's RFC

21  assessment simply does not distinguish between plaintiff's pre-surgery functional limitations and

22  plaintiff's hypothetical post-surgery functional limitations as Dr. Contreras described them.  It is

23  unclear whether the ALJ accepted or rejected Dr. Contreras' opinion that plaintiff's having 20/50

24  vision and an ability to work are contingent on surgery.  The ALJ's failure to resolve this

25  inconsistency in the vision-related medical evidence amounts to error.  On remand, the ALJ

26  should thoroughly address the matter of plaintiff's need for eye surgery, which may potentially

1  include seeking clarification(s) from Dr. Contreras or other examining physician(s) as the ALJ

2  deems necessary.

3              2.    *Ability To Pay For Surgery*

4              While plaintiff argues that he cannot afford eye surgery and should not be

5  penalized for this inability (Mot. for Summ. J. at 14), the argument is not well-taken.  Plaintiff

6  identifies evidence suggesting plaintiff's inability to afford eye surgery.  (AT 41.)  However, the

7  ALJ's opinion makes no mention of eye surgery.  There is no indication that the ALJ construed

8  plaintiff's lack of eye surgery against plaintiff anywhere in the five-step analysis.  As discussed

9  above, the threshold issue is whether the ALJ's RFC assessment is properly based upon

10  plaintiff's *present* visual abilities versus the *hypothetical* visual abilities he may have after eye

11  surgery.  Because the ALJ did not address the record's ambiguities regarding this threshold issue,

12  the ALJ also did not address the secondary issue of whether plaintiff could afford such surgery.

13             Depending on the circumstances of a given case, "disability benefits may not be

14  denied because of the claimant's failure to obtain treatment [he or she] cannot obtain for lack of

15  funds."  Orn v. Astrue, 495 F.3d 625, 638 (9th Cir. 2007) (quoting Gamble v. Chater, 68 F.3d

16  319, 321 (9th Cir. 1995)); Regennitter v. Comm'r of the Soc. Sec. Admin., 166 F.3d 1294, 1297

17  (9th Cir. 1999).  Regardless, nothing in the ALJ's opinion indicates that the ALJ considered

18  plaintiff's having not undergone eye surgery to amount to an improper failure to obtain treatment,

19  or as grounds for disbelieving plaintiff's testimony, or as otherwise weighing against plaintiff's

20  disability status.  In other words, there is no indication that the ALJ construed plaintiff's having

21  not undergone eye surgery as a reason to deny benefits.  Accordingly, because the ALJ's decision

22  does not discuss eye surgery in the first place, it cannot be said that the ALJ penalized plaintiff

23  for failing to undergo such surgery, whether for financial reasons or otherwise.

24             3.    *Dr. Jackson's Opinion*

25             As plaintiff also argues, the ALJ gave "significant weight" to the opinion of non-

26  examining physician Dr. Jackson (AT 247-51), who reviewed Dr. Contreras' opinion and other

medical evidence.  (AT 22, 239-40.)  Yet Dr. Jackson made no mention of Dr. Contreras'
apparent belief that plaintiff needed *surgery* before he would be "functional in the work setting."
(AT 22; 240, 247-51.)  The ALJ's reliance on Dr. Jackson's opinion thus does not resolve the
record's above-described ambiguity with respect to plaintiff's need for eye surgery.

Further, Dr. Jackson opined that plaintiff's visual abilities limited plaintiff to
work that would not require "binocular vision" or "fine, detailed work."  (AT 249.)  As plaintiff
notes, however, although the ALJ gave Dr. Jackson's opinion "significant weight," the ALJ's
RFC assessment did not clearly include these limitations.  (AT 20, 22.)  Defendant argues that
any error with the ALJ's RFC assessment was harmless given that the RFC effectively
encompassed these limitations by excluding work requiring "fine visual acuity" or exposure to
"hazards."  (Opp'n at 10-11.)  Yet defendant does not cite to authorities or compellingly explain
*how* limiting plaintiff to work not involving "fine visual acuity" or exposure to "hazards"
adequately encompasses jobs not involving "fine, detailed work" or "binocular vision."  Upon
remand, the ALJ will have an opportunity to consider whether his RFC assessment should or
should not be revised to materially account for all limitations within Dr. Jackson's opinion.  (AT
22.)

IV.   CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.   Plaintiff's motion for summary judgment (ECF No. 13) is GRANTED IN
PART.

2.   The Commissioner's cross-motion for summary judgment (ECF No. 16) is
DENIED.

3.   The action is REMANDED for further proceedings consistent with this
order pursuant to sentence four of 42 U.S.C. § 405(g).

4.   Judgment is entered for plaintiff.

////

1        5.     The Clerk of Court is directed to close this case and vacate all dates.

2        IT IS SO ORDERED.

3  DATED:  August 30, 2013

4

5

  KENDALL J. NEWMAN
6  UNITED STATES MAGISTRATE JUDGE